UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AEYE, INC.
f/k/a CF FINANCE ACQUISITION CORP. III,

                              Plaintiff,

            v.                                    Case No. 1:22-cv-04964

ALL BLUE FALCONS FZE,

                              Defendant.

## ANSWER AND COUNTERCLAIMS

All Blue Falcons FZE ("Falcons FZE" or "Defendant"), by its undersigned attorneys, Olshan Frome Wolosky LLP, submits this Answer to the Complaint and Counterclaims filed in this action by AEye, Inc. f/k/a CF Finance Acquisition Corp. III ("AEye" or "Plaintiff") and alleges as follows:

## NATURE OF ACTION

1.      Falcons FZE admits that it executed a written agreement which states that it would pay $5,000,000 to purchase certain shares of Plaintiff, which has not been paid.  Falcons FZE denies that it is required to pay that amount, and denies that it lacks justification for the non-payment.  The rest of the allegations set forth in paragraph 1 of the Complaint constitute legal conclusions to which no response is required.

2.      Falcons FZE admits that it entered into the Subscription Agreement and refers the Court to that document for a full and complete recitation of its contents.

3.      Falcons FZE admits that the Merger was consummated in August 2021, and otherwise denies the allegations set forth in Paragraph 3 of the Complaint.

4.      Falcons FZE admits that it did not deliver the purchase funds. The remainder of the allegations set forth in Paragraph 4 of the Complaint constitutes legal conclusions to which no response is required.  To the extent a response is deemed required, Falcons FZE denies.

5.      Falcons FZE denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Complaint.

## THE PARTIES

6.      Falcons FZE denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint.

7.      Falcons FZE admits that it is a business entity organized in the United Arab Emirates ("UAE").

8.      Falcons FZE denies the allegation in Paragraph 8 that its principal place of business is located in London, United Kingdom, and lacks information or knowledge sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 8, except admits that it executed the Subscription Agreement and refers the Court to that document for a full and complete recitation of its contents.

9.      Falcons FZE admits that its principal place of business is located in Dubai, UAE.

## JURISDICTION

10.     Falcons FZE admits the allegations in Paragraph 10 of the Complaint.

11.     Falcons FZE denies knowledge or information sufficient to form a belief as to the truth of the allegations with regard to Plaintiff set forth in Paragraph 11 of the Complaint.  Falcons further denies that it is a citizen of the UK, but admits that it is a citizen of the UAE.

12.     Falcons FZE admits that the Court has personal jurisdiction over Falcons FZE.

13.     Falcons admits that venue is proper in the Southern District of New York.

## FACTUAL BACKGROUND

**A.      The SPAC**

14.      Falcons FZE denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint.

15.      Falcons FZE admits that a SPAC can be an investment vehicle organized by one or more sponsors to raise capital, typically for the purpose of acquiring and/or merging with a target private company in a transaction that effectively takes the target company public.  Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15.

16.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint.

17.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint.

18.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint.

19.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint.

**B.      The Merger Plan and Agreement**

20.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint.

21.      Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint regarding CF III's plans, but admits that CF III renamed itself AEye, Inc. after completion of the merger with its target.

22.     Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint.

**C.      The Subscription Agreement**

23.     Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint.

24.     Falcons FZE admits that CF II sold shares at $10.00 per share and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint.

25.     Falcons FZE admits that it is affiliated with All Blue Capital, but states that it lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 25 of the Complaint.

26.     Falcons FZE admits the allegations in Paragraph 26 of the Complaint.

27.     Falcons FZE admits that the Subscription Agreement provides for certain conditions to closing, and refers the Court to the Subscription Agreement for a complete and accurate recitation of its contents.

28.     Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint.

29.     Falcons FZE admits that the Subscription Agreement provides for certain conditions to closing, and refers the Court to the Subscription Agreement for a complete and accurate recitation of its contents.

30.     Falcons FZE denies the truth of the allegations in Paragraph 30 of the Complaint, regarding the requirements on Falcons FZE, and lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 30 of the Complaint.

31.     Falcons FZE denies the truth of the allegations in Paragraph 31 of the Complaint, and refers the Court to the referenced documents for a complete and accurate description of their contents.

32.     Falcons FZE denies the truth of the allegations in Paragraph 32 of the Complaint, and refers the Court to the referenced documents for a complete and accurate description of their contents.

**D.      All Blue Breaches the Subscription Agreement by Failing to Provide the Purchasing Funds**

33.     Falcons FZE denies the allegations in Paragraph 33 of the Complaint.

34.     Falcons FZE admits that Daniel Cookson is the Director of Falcons FZE, and that Matt Novak is the Managing Partner of Falcons FZE, and that on August 5, 2021 CF III's counsel sent a Subscription Agreement Closing Notice ("Notice of Closing") to Messrs. Cookson and Novak, and refers the Court to the Notice of Closing for a complete and accurate description of their contents.

35.     Falcons FZE refers the Court to the referenced Notice of Closing for a complete and accurate description of their contents.

36.     Falcons FZE admits that Plaintiff contacted All Blue on August 12, 2012, and refers the Court to the referenced communication for a complete and accurate description of its contents.

37.     Falcons FZE denies the allegations of Paragraph 37.

38.     Falcons FZE denies the allegations of Paragraph 38.

39.     Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39.

40.     Falcons FZE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, except admits that CF III changed its name to AEye, Inc.

41.     Falcons FZE denies the allegations of Paragraph 41.

**E.     All Blue Fails to Remedy its Breach of the Subscription Agreement**

42.     Falcons FZE denies the truth of the allegations in Paragraph 42 of the Complaint, and refers the Court to the referenced documents for a complete and accurate description of their contents.

43.     Falcons FZE denies the allegations in Paragraph 43 of the Complaint, and refers the Court to the referenced documents for a complete and accurate description of their contents.

44.     Falcons FZE denies the allegations in Paragraph 44 of the Complaint, and refers the Court to the referenced documents for a complete and accurate description of their contents.

45.     Falcons FZE denies the allegations in Paragraph 45 of the Complaint.

46.     Falcons FZE denies the allegations in Paragraph 46 of the Complaint, except admits that, to date, it has not paid AEye $5,000,000.

**CAUSE OF ACTION**
**<u>BREACH OF CONTRACT</u>**

47.     Falcons FZE realleges and incorporates its responses to Paragraph 1 through 46 of this Complaint as though fully set forth herein.

48.     Falcons FZE denies the allegations in Paragraph 48, except that it admits that Plaintiff and Falcons FZE entered into the Subscription Agreement on February 17, 2021.

49.     Falcons FZE denies the allegations in Paragraph 49.

50.     Falcons FZE denies the allegations in Paragraph 50.

51.     The allegations in Paragraph 51 are a legal conclusion to which no response is required.  To the extent a response is deemed necessary, Falcons FZE denies the allegations in Paragraph 51.

52. The allegations in Paragraph 52 are a legal conclusion to which no response is required. To the extent a response is deemed necessary, Falcons FZE denies the allegations in Paragraph 52.

53. The allegations in Paragraph 53 assert a legal conclusion to which no response is required. To the extent a response is deemed necessary, Falcons FZE denies the allegations in Paragraph 53.

54. The allegations in Paragraph 54 are a legal conclusion to which no response is required. To the extent a response is deemed necessary, Falcons FZE denies the allegations in Paragraph 54.

Falcons FZE further denies that Plaintiff is entitled to any damages, relief, judgment, award, specific performance, fees, or costs whatsoever, including but not limited to the damages and judgment requested in the Demand for Relief following paragraph 54.

## **AFFIRMATIVE DEFENSES**

### **FIRST DEFENSE**

55. The Complaint fails to state a claim against Defendant upon which relief can be granted and therefore should be dismissed.

### **SECOND DEFENSE**

56. Plaintiff's claims are bared because of its own breach of its contractual obligations, and/or failure by Plaintiff to satisfy conditions precedent to any obligation by Defendant.

### **THIRD DEFENSE**

57. Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands, waiver, estoppel, and/or by Plaintiff's own inequitable or wrongful conduct.

**FOURTH DEFENSE**

58.     To the extent Plaintiff has any injuries or damages, such injuries or damages were the result of the acts of third parties over which Falcons FZE had no responsibility or control.  Any damage, loss, or liability sustained by Plaintiff must be reduced, diminished, and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Falcons FZE under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and comparative fault.

**FIFTH DEFENSE**

59.     Plaintiff's claim is barred, in whole or in part, based on Plaintiff's misrepresentations and/or Plaintiff's negligent and/or fraudulent inducements.

**SIXTH DEFENSE**

60.     Defendant is excused from performance by the occurrence of a Material Adverse Effect ("MAE").

**SEVENTH DEFENSE**

61.     Plaintiff's claims are barred, in whole or in part, because of Plaintiff's own inequitable or wrongful conduct.

**EIGHTH DEFENSE**

62.     Plaintiff's claims are barred, in whole or in part, by the doctrine of frustration of purpose and/or impossibility of performance.

**NINTH DEFENSE**

63.     Plaintiff's claims are barred due to insufficient process and/or insufficient service of process.

**TENTH DEFENSE**

64.     Plaintiff's claims are or may be barred, in whole or in part, because Plaintiff failed to mitigate its alleged damages.

Defendant Falcons FZE reserves all rights to amend its answer to assert such other affirmative defenses as may arise during the course of discovery and motion practice in this matter.

**JURY DEMAND**

Defendant demands a trial by jury of all issues so triable.

**DEFENDANT'S COUNTERCLAIMS**

Defendant All Blue Falcons FZE ("Falcons FZE"), by its attorneys, Olshan Frome Wolosky, LLP, repeats, realleges, and incorporates the averments in its Answer to the Complaint as if fully set forth herein, and further alleges as follows:

**NATURE OF THE ACTION**

1.     This action arises out of certain misrepresentations made by Plaintiff/Counterclaim-Defendant AEye, Inc. f/k/a CF Finance Acquisition Corp. III ("CF III") to Defendant/Counterclaim-Plaintiff Falcons FZE, which induced Falcons FZE's agreement to the Subscription Agreement between the parties signed February 17, 2021 (the "Subscription Agreement").

2.     The Subscription Agreement provided that certain private placements of CF III shares would be made in connection with the closing of a transaction detailed by an Agreement and Plan of Merger, dated as of February 17, 2021, by and among CF III, its wholly owned subsidiary Meliora Merger Sub, Inc., and CF III's target, legacy AEye, Inc. ("Legacy AEye") (the "Transaction Agreement").

3.     Between the signing of the Subscription Agreement and the August 16, 2021 closing of the acquisition of Legacy AEye (the "Closing"), Falcons FZE learned of multiple facts

regarding CF III and Legacy AEye that revealed that representatives and affiliates of CF III had misrepresented to Falcons FZE critical details regarding the investment that it believed it was making. Through these misrepresentations, CF III induced Falcons FZE to enter into the Subscription Agreement.  Because Falcons FZE was fraudulently induced into entering the agreement, the Subscription Agreement is null and void ab initio.

4.      The Subscription Agreement also provides that each subscriber's obligation to perform under the Subscription Agreement is subject to requirements that, on the Closing date, certain conditions to closing would be met (the "Closing Conditions") and that all representations and warranties of the Company contained in the Subscription Agreement would be true and correct in all material respects at and as of the Closing Date (Subscription Agreement § 2(c)(i)) (the "Rep And Warranty Condition").

5.      The Closing Conditions and the Rep and Warranty Condition were not met.  These failures excused Falcons FZE from consummating the Closing. It is entitled to a declaratory judgment to that effect.

## **PARTIES**

6.      Falcons FZE is a private company organized in the Ras Al Kaihamh Economic Zone of the Emirate of Ras Al Khaimah in the United Arab Emirates in Dubai, United Arab Emirates.

7.      On information and belief, AEye is a public company incorporated under the laws of Delaware, and headquartered in Dublin, California.  Upon information and belief, AEye was originally incorporated under Delaware law as a special purpose acquisition company named CF Finance Acquisition Corporation III, and it was renamed AEye, Inc. after it acquired Legacy AEye. The post-Combination AEye (like Legacy AEye), is now a provider of LiDAR systems technology

for vehicle autonomy, advanced driver-assistance systems, or ADAS, and robotic vision applications. In these counterclaims, Defendant/Counterclaim Plaintiff will use "CF III" when denoting AEye as it existed prior to the Closing.

## JURISDICTION

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on diversity of citizenship and the amount in controversy exceeds $75,000.

9.      Both parties have consented to personal jurisdiction in the United States District Court for the Southern District of New York.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

11.     In March 2016, CF III was formed as a special purpose acquisition company ("SPAC").  Upon information and belief, SPACs are investment vehicles organized by sponsors, which raise capital through a variety of means for the purpose of acquiring and/or merging with a target private company in a transaction that effectively results in that target company becoming public.

12.     CF III raised approximately $230 million in its initial public offering in November 2020 and became listed on the NASDAQ Capital Market.

13.     CF III's sponsor was CF Finance Holdings III, a Delaware limited liability company that was 100% owned by Cantor Fitzgerald, L.P. ("Cantor").  Cantor is a global financial services group with over 12,000 employees.  In its public filings, CF III disclosed that it "was sponsored by Cantor Fitzgerald."

14.     At all times relevant hereto, Cantor acted as the agent for CF III and was authorized to speak on its behalf.  Cantor represented that it had the authority to speak on behalf of CF III in connection with the SPAC transaction.

15.     CF III's Chief Executive Officer ("CEO") from March 2016 until the Closing, was Howard Lutnick ("Lutnick").  Since 1996, Lutnick has also served as the Chairman and CEO of Cantor.  Additionally, CF Group Management, Inc. ("CFGM") is the managing general partner of Cantor, and Lutnick is the trustee of CFGM's sole stockholder.

16.     At all times relevant hereto, Lutnick acted on behalf of CF III.

17.     CF III's underwriters in its IPO were Cantor Fitzgerald & Co. ("CF & Co."), an investment bank and prime brokerage and yet another Cantor affiliate. Cantor and CF & Co. collaborated on multiple SPAC projects, and CF & Co. provided investment banking services to CF III in connection with the transaction with AEye.

18.     From the beginning, the CF III SPAC transaction process was rife with conflicts of interest.  CF III's Amended Form S-1 identified multiple potential conflicts of interest, stemming from the multiple roles of Cantor and Cantor-affiliates, including but not limited to:

- Our officers and directors may have conflicts of interest with other entities to which they owe fiduciary or contractual obligations with respect to initial business combination opportunities, including for our officers with respect to the Prior Cantor SPACs. In order to minimize potential conflicts of interest which may arise from multiple affiliations, our officers who are also officers of any of the Prior Cantor SPACs will be required to present all suitable target businesses to the applicable Prior Cantor SPAC (including Cantor SPAC I only in the event that the transaction with Grosvenor Capital is not consummated) prior to presenting them to us, unless such opportunity is expressly offered to such individual solely in his capacity as an officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue, and to the extent such individual is permitted to refer that opportunity to us without violating another legal obligation.

- CF III was deemed to be an affiliate of CF&Co, a member of the Financial Industry Regulatory Authority or FINRA. As a result, CF&Co is deemed to have a "conflict of interest" under Rule 5121(f)(5) of the Conduct Rules of FINRA.

19.     These, however, were not the only conflicts of interest. SPAC sponsors have a limited period of time to find and merge with a target—typically two years.  If they do not successfully merge with the target, the SPAC is dissolved and the money from the SPAC IPO is returned to its stockholders.

20.     Because SPAC sponsors purchase their special Class B shares (the "promote") at a dramatically discounted price of $25,000, it is frequently to a sponsor's economic benefit to close a transaction with an underperforming target rather than to allow the SPAC to abandon a deal, return the IPO proceeds to stockholders, and dissolve.

21.     The Office of Senator Elizabeth Warren has sounded the alarm regarding the potential for fraud in the SPAC process.  In May 2022, it published a report, *The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders* (the "Report"), which specifically discusses Cantor's conflicted business practices.  Among other things, the Report states:

- One key problem with SPACs is that the investors who bankroll them do not necessarily have a stake in the long-term success of the companies they bring public. The misaligned incentives for SPAC sponsors, who are given a "promote," or 20% stake, in the public company following the merger with a private company, gives them an all-but-guaranteed profit, putting retail investors at increased risk and allowing companies with significant weaknesses to bypass the disclosures required of a traditional IPO.

- Since SPACs face time pressure to complete a merger… SPAC sponsors are incentivized to push low-quality deals to ensure they receive their promote. From 2019 to 2021, SPAC sponsors received average returns of 958 percent, even as companies taken public by SPACs consistently underperformed the market and retail investors took losses.

- Financial institutions have benefited from the SPAC boom by charging various hidden fees that outstrip those of a traditional IPO, including an underwriter fee, a PIPE placement agent fee, and a financial advisor fee. According to information provided by major SPAC backer Cantor

Fitzgerald, in their role as underwriters, they received fees equal to 5.5-6.0% of the amount raised in the IPO, with a 2.0% underwriting fee at the closing of the IPO. In some cases, the company also received a capital markets advisory fee equal to 3.5% of the amount raised in the IPO and 5.5% of the over-allotment option. And in its role as a SPAC sponsor, Cantor Fitzgerald paid their financial backers a 3.0% PIPE placement fee and M&A advisory fees consisting of several million in dollars or shares.

- Because the SPAC sector is oversaturated and sponsors are incentivized to make a deal regardless of quality, there have been multiple cases where companies used inflated information about their financials, their future business, or even their underlying technology.

22.    That Report also specifically identifies the AEye transaction as an example of the inequitable and potentially fraudulent consequences of the conflict-laden SPAC process run by Cantor:

- Cantor Fitzgerald brought AEye, a company that provides LiDAR (Light Detection and Ranging) for transportation systems through a merger with CF Finance Acquisition Corp. [III] in February 2021 with AEye initially valued at $2 billion, The company's stock value decreased by 64 percent in 2021 and was trading below $3.00 per share in February 2022, a loss for retail investors of over 70%. But Cantor Fitzgerald did just fine: the company earned over $17.6 million in fees.

23.    As a result of the conflicts of interest of Cantor and its affiliates and in order to benefit its sponsor, CF III chose a poor SPAC investment target, Legacy AEye, and then used misrepresentations and material omissions to induce PIPE subscribers, including Falcons FZE, to participate in the transaction with AEye.

24.    CF III, and Cantor acting on CF III's behalf, intentionally or with reckless indifference to the truth, misstated the Company's business condition, plans and prospects to Falcons FZE, fraudulently inducing Falcons FZE to execute the Subscription Agreement.

**Transaction Agreement and PIPE Transaction**

25.    In early February 2021, Mr. David Batalion, the Head of SPACs at Cantor, contacted Matt Novak, a principal of Falcons FZE, on behalf of CF III.  Over several chats and

calls, Mr. Batalion invited Falcons FZE to participate in a private investment in public equity ("PIPE") transaction in connection with CF III's anticipated merger with Legacy AEye and public listing of AEye through the SPAC process.

26.     For example, on February 1, 2021, Mr. Batalion stated that the deal between CF III and Legacy AEye was going to be "white hot" and "a really great deal" and stated that insiders had, "even before we start" the roadshow, given indication that they would make over $100 million of PIPE financing in the deal.

27.     On February 4, 2021, Batalion again spoke with Novak on behalf of CF III.  During this conversation, Mr. Batalion indicated that AEye, Inc. was best-in-class among LiDaR companies.  He further represented that AEye had a full pipeline of advantageous contracts and promised that AEye had a strong pipeline of deals that would shortly be consummated.  Based on these purported facts, Mr. Batalion represented that AEye's stock price would rise post-Merger above the $10.00 per share price set for both the CF III SPAC offering and the PIPE investment.

28.     On or around February 10, Mr. Batalion's colleague Kevin Brennan again assured Falcons FZE that the CF III-Legacy AEye deal would be successful, that the post-combination company's market value would exceed the transaction price, and that the Company's value was assured by Legacy AEye's pipeline and future profits.

29.     Mr. Lutnick, CEO of CF III, also represented to Falcons FZE in the weeks before February 17, 2021, that Legacy AEye had a strong pipeline of advantageous contracts and that AEye would be a highly profitable investment based upon this robust pipeline.

30.     These representations regarding AEye were false at the time they were made.

31.     Cantor and CF III also provided Falcons FZE with access to a dataroom containing Legacy AEye's financial information, projections, and an investor presentation, and coordinated a conference call with Legacy AEye representatives.

32.     Cantor, CF III, and Legacy AEye further represented that the Company had a pre-transaction enterprise valuation of $1.9 billion (and a post-transaction value of $2.0 billion), and that they expected AEye to have revenue CAGRs (compound annual growth rates), gross margins, and EBITDA margins superior to its competitors (including Luminar and Velodyne, both publicly-traded LiDAR companies).[1]

33.     The investor presentation, which CF III filed with the SEC on February 17, 2021, further represented that the pro forma enterprise valuations of AEye ranged from $3.6 billion to $7.6 billion based on AEye's five-year long-term projections (2021-2026)[2]. CF III represented that the $2.0 billion transaction value for CF III was to be sold at a favorable discount of 63 percent from the midpoint of what it represented to be the implied value of the Company of $5.4 billion dollars.[3]

34.     CF III and Cantor knew, had reason to know, or were reckless to the truth, that the Company's financial information and projections were flawed, and that the valuation stated in the investor presentation was not supportable when they made the representations to Falcons FZE in February 2021.

---

[1] Ex. 99.2 (Form of Investor Presentation) to Form 8-K at 40, 41, filed with the SEC on February 17, 2021, available at: https://www.sec.gov/Archives/edgar/data/1818644/000121390021009944/ea135852ex99-2_cffinance3.htm (hereinafter, the "First Investor Presentation").
[2] *See* First Investor Presentation at 43.
[3] *See id.*

35.     Falcons FZE reasonably relied on CF III's representations through Lutnick, Batalion, and Cantor, as well as the financial information and projections in the data room, in deciding to execute the Subscription Agreement.

36.     On February 17, 2021, CF III signed the Transaction Agreement with Legacy AEye.  Simultaneously, CF III entered into subscription agreements with PIPE investors to complete financing for the closing of the merger between CF III and Legacy AEye.

37.     Relying on the information and representations from CF III, Cantor, and Legacy AEye regarding AEye's pipeline, solid financials, and robust future financial performance, Falcons FZE entered into the Subscription Agreement on February 17, 2021, and agreed to purchase 500,000 shares in CF III.

38.     The Subscription Agreement recited certain required conditions to consummate the Closing, including that all representations and warranties of the Company contained in the Subscription Agreement were true and correct in all material respects.

39.     The Subscription Agreement further provided Falcons FZE's obligations were contingent on certain other conditions, including:

> (iii) no amendment or modification of the Transaction Agreement (as the same exists on the date hereof as provided to the Subscriber) shall have occurred that would reasonably be expected to materially and adversely affect the economic benefits that the Subscriber would reasonably expect to receive under this Subscription Agreement.

40.     CF III further represented, warranted, and covenanted that:

> (m) SEC Reports; Financial Statements. As of their respective dates, all forms, reports, statements, schedules, proxies, registration statements and other documents filed by the Company with the Commission prior to the date of this Subscription Agreement (the "SEC Reports") complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and ***none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements***

> ***therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing*** and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the Commission since its initial registration of the ordinary shares with the Commission.

(Emphases added, and together with the prior condition, the "Subscriber Conditions").

41.     At the time that Falcons FZE entered into the Subscription Agreement in February 2021, CF III represented that the pre-combination Legacy AEye was valued at approximately $1.9 billion with a present discounted enterprise value ranging between $3.6 and $7.6 billion (the "Implied Present Enterprise Value").[4]

42.     But, on May 3, 2021, CF III and Legacy AEye amended their merger agreement (the "Amended Transaction Agreement") to value the Company at $1.5 billion – approximately $400 million lower than the valuation represented to Falcons FZE at the time it entered into the Subscription Agreement.

43.     In connection with this amendment, CF III filed with the SEC an amended investor presentation.   This presentation also reflected lower revenue, EBITDA, and gross profit projections.[5]

44.     The near-term projections had also been lowered.  As of February 17, 2021, CF III and AEye had stated expected revenues of $4 million and gross profit of $1 million for FY2021.

---

[4] First Investor Presentation at 30, 45.
[5] Ex. 99.1, Form of Investor Presentation, to Form 8-K, filed with the SEC on May 12, 2021, available at https://www.sec.gov/Archives/edgar/data/1818644/000121390021025706/ea140553ex99-1_cffinance3.htm, at 29 (hereinafter, "Second Investor Presentation").

By May 3, 2021—not even three months later—CF III and AEye had lowered FY 2021 revenue expectations to $3 million, a 25 percent decrease, and admitted that the Company would have no gross profits that year.[6] In fact, AEye reported in its Form 10-K, that as of December 31, 2021, it had booked $3 million in revenue as of December 31, 2021 and booked a gross *loss* of $630,000.[7]

45.     Not only had the valuation for the pre-transaction company had declined from $1.9 to $1.5 billion, the expected value of the pro-forma company had also declined from $2.0 billion to $1.6 billion,[8] as a result of the amendment.

46.     Moreover, the accompanying revised Investor Presentation deliberately omitted the $3-7 billion "Implied Present Enterprise Value" as well as CF III's comparisons of AEye to its peers, which had previously been represented to Falcons FZE.[9] On information and belief, these omissions reflected CF III and/or Cantor's recognition that the originally stated Implied Present Enterprise Value was false and unreliable when made or had become false and unreliable because it depended on overinflated assumptions and illusory long-term projections.

47.     On information and belief, CF III and Cantor knew that the initial valuation as of February 17, 2021, was overinflated and based on flawed or fraudulent assumptions.  Not even three months later, CF III had adjusted its projections of AEye's expected performance downward. Yet it failed to include in the updated May presentation any statements regarding the Implied Present Enterprise Value of the combined company.  CF III and Cantor knew that the prior stated valuation was inflated, and they intentionally concealed and omitted the inflated valuation from later filings because CF III intended that PIPE investors, including Falcons FZE, would rely on those prior statements and perform under the Subscription Agreement.

---

[6] Second Investor Presentation at 29.
[7] Form 10-K of AEye, Inc. for year ending December 31, 2021, filed with the SEC on March 28, 2022.
[8] Second Investor Presentation at 30.
[9] *See* Second Investor Presentation, generally.

48.     CF III also restated its financial statements in violation of the representations in the Subscription Agreement.  On May 4, 2021, the Company made public filings stating that it would "restate its historical financial results" to reflect the reclassification of the SPAC warrants as liabilities (the "Restatement").

49.     On June 21, 2021, View, Inc., another Cantor SPAC in which Falcons FZE had invested, also revealed that it would restate its historical financial results and reclassify its SPAC warrants as liabilities.  This underscored to Falcons FZE the misrepresentations that had been made with respect to AEye.

50.     On June 23, 2021, further revelations emerged concerning representations made by Mr. Lutnick, CF III's CEO, in support of the AEye transaction.  Journalist Heather Perlberg published an article on *Bloomberg* titled, "*The SPAC Man Method: Inside the Billionaire Rush for Riches*."  The article recounted numerous false inducements by Mr. Lutnick made to potential PIPE investors in AEye based upon records of the meeting at which the statements were made. Upon information and belief, Mr. Lutnick stated to potential PIPE investors in AEye that "[o]nce [CF III] acquired AEye… analysts could be handed information about AEye's progress with business partners," and that "he'd help analysts get the information they'd need to work up reports. AEye wouldn't say a word or divulge anything itself… but Cantor could find ways around that."

51.     According to the article, a spokesperson for Cantor officially denied that Cantor or Mr. Lutnick had "ever spoken to analysts of financial firms with respect to Cantor sponsored SPACs," and a representative for Legacy AEye said that "the company's CEO denies that Lutnick told potential investors he could use analysts to distribute sensitive information."  The article acknowledged the obvious – that these false statements had been part of how CF III had obtained the original $225 million PIPE investment.

52.     Falcons FZE became aware of the article, and those allegations created further concern regarding the trustworthiness and accuracy of the representations that Mr. Lutnick, CF III, and Cantor had made to Falcons FZE regarding CF III and post-combination AEye.

53.     By the time the transaction was set to close, in August 2021, Mr. Lutnick and Cantor's conduct and candor had already been brought into question in respect to Falcons FZE's prior investment in View, Inc.  Falcons FZE determined that Mr. Lutnick, CF III, and Cantor had also misled Falcons FZE into the investment into CF III/AEye.

54.     Upon information and belief, the merger between CF III and Legacy AEye closed on August 16, 2021.

55.     That same day, View, Inc., publicly disclosed that it had "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual." View's stock price fell more than 24% on this news. Since that disclosure, its stock price has not risen above $6.51 per share – far less than the $10.00 per share at which Cantor had sold View, Inc. stock.

56.     Several law firms announced that they were investigating View, Inc., in connection with these disclosures.  Falcons FZE began an internal review of its activities involving Cantor.

57.     Since the Merger, AEye's performance has been similarly abysmal. Post-Closing, AEye's stock price has slid steadily downward, consistently closing under $10.00 per share (the PIPE transaction price), with one solitary exception.

58.     As of the filing of this Answer, AEye's average stock price for the last ten trading days is $1.16 per share, and its market capitalization is under $190 million – remarkably, less than 10 percent of the originally stated pro forma enterprise valuation, and approximately 5 percent of the lowest Implied Present Enterprise Value originally provided by CF III.

59.     The promised pipeline of lucrative contracts did not exist and never materialized at AEye. Contrary to Mr. Lutnick and CF III's representations, AEye depends on one major customer for the majority of its revenues.[10]

60.     AEye is, and was as of February 17, 2021, worth far less than CF III represented, a fact that CF III and its bankers knew before the signing of the Subscription Agreement.

61.     CF III was motivated to secure PIPE investments so that Cantor and its affiliates (the sponsors and bankers) could benefit from the SPAC transaction. CF III's sponsor, which was 100 percent owned by Cantor, had purchased its 5,710,000 sponsor shares for $25,000. Even at a post-combination stock price of $1.16, those shares are worth $ 6,623,600 – a profit of $6,598,600 for Cantor. CF&Co. also made millions of dollars from the investment banking services it provided to CF III.

62.     To secure the PIPE investments, CF III's representatives and agents (including Cantor) represented to Falcons FZE a valuation for AEye that they knew, or were reckless in not knowing, is overinflated, or that they themselves did not believe.

63.     On information and belief, the statements regarding AEye's expected valuation depended on flawed assumptions regarding future performance that were not derived from the standard process AEye used to create its valuations. On July 19, 2021, Legacy AEye's CFO had in fact indicated that those projections reflected a "major growth curve" for the Company, resulting in (revised) revenue projections of $605 million for FY2026[11] – orders of magnitude greater than the $3 million projection for FY2021—more than Legacy AEye had ever made and along a growth trajectory that AEye had not previously experienced. On information and belief, the major growth

---

[10] *See* AEye Form 10-K for the period ending December 31, 2021 ("Although we have and continue to pursue a broad customer base, we are dependent on a collection of customer relationships which are currently in development with strong purchasing power. In 2021, Continental AG accounted for approximately 55% of our annual revenue….").
[11] *See* Rule 425 Communications filed by CF III with the SEC on July 19, 2021, Transcript of AEye Investor Day.

curve reflected projections that were manufactured out of whole cloth for the purpose of inducing

investments in connection with the merger with CF III.

64.     Additionally, as described above, CF III failed to meet the condition that "none of

the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state

a material fact required to be stated therein or necessary in order to make the statements therein,

in the light of the circumstances under which they were made, not misleading," as required by the

Subscription Agreement.  Several of CF III's SEC Reports did in fact contain untrue statements or

omitted to state material facts.

65.     Because certain Subscriber Conditions were not met, Falcons FZE is not obligated

to consummate the closing under the terms of the Subscription Agreement.  Further, because CF

III breached certain representations and warranties, and because the Subscription Agreement was

fraudulently induced, Falcons FZE had no obligation to close.

## FIRST CAUSE OF ACTION

(Declaratory Judgment)

66.     Defendant repeats and realleges paragraphs 1 – 65 of their Counterclaims as if fully

set forth herein.

67.     Pursuant to 28 U.S.C. § 2201, this Court is empowered to "declare the rights and

other legal relations of any interested parties" where there is an actual controversy amongst the

parties.

68.     The Subscription Agreement provides certain Subscriber Conditions to closing,

which were not met as described above.

69.     Plaintiff has breached and cannot enforce the Subscription Agreement.

70.     Furthermore, Falcons FZE was induced into entering the Subscription Agreement by fraudulent misrepresentations and omissions made by CF III, Mr. Lutnick, and Cantor acting as the agent of CF III.

71.     Defendant is entitled to a declaratory judgment that Plaintiff cannot enforce the Subscription Agreement and that Defendant is not obligated to make any payments to Plaintiff pursuant to the Subscription Agreement.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

72.     Defendant repeats and realleges paragraphs 1 – 71 of its Counterclaims as if fully set forth herein.

73.     Plaintiff breached the Subscription Agreement by failing to achieve the conditions to closing required under the agreement.

74.     Plaintiff breached the Subscription Agreement by falsely representing that its filings with the Securities and Exchange Commission complied with all applicable laws, rules, and regulations.

75.     Plaintiff breached the Subscription Agreement by amending the Transaction Agreement.

76.     By reason of Plaintiff's breach, Defendant was relieved of any obligation to perform under the Subscription Agreement.

77.     Defendant has been damaged as a direct and proximate cause of Plaintiff's breach. Defendant has suffered damages as a result of Plaintiff's breach that were foreseeable at the time of contracting in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Fraudulent Inducement)

78.     Defendant repeats and realleges paragraphs 1 – 77 of its Counterclaims as if fully set forth herein.

79.     Plaintiff represented to Defendant as an inducement to enter into the Subscription Agreement that the true value of the post-combination Company would be over $3.6 billion dollars, and that its target, Legacy AEye, had a solid and assured pipeline of contracts.

80.     Plaintiff understood that Defendant would rely upon its representations in entering the Subscription Agreement, and Defendant did in fact rely on these representations.

81.     The misrepresentations and omissions were made with the intention of inducing Defendants to enter into the Subscription Agreement.

82.     Plaintiff always knew, had reason to know, or was reckless in not knowing that the post-combination Company is worth dramatically less than it stated to Falcons FZE. To solicit PIPE investments and secure a profit for its sponsor and controller, Cantor, Plaintiff made false statements in connection with soliciting the PIPE transaction, including but not limited to the statements made on behalf of CF III to Falcons FZE soliciting the agreement and the failure to disclose that the valuation of the Company was built on flawed assumptions.

83.     Plaintiff knew that there was no pipeline of contracts at legacy AEye and that post-merger AEye would not emerge with a strong pipeline of advantageous contracts.

84.     Defendant reasonably and justifiably relied on these false statements to its detriment by entering into the Subscription Agreement.  Had it known the truth, Defendant would not have executed the Subscription Agreement.

85.     By reason of Plaintiff's misrepresentations, the Subscription Agreement is unenforceable and void ab initio.

Wherefore, Defendants/Counterclaim-Plaintiffs requests the Court to enter Judgment in its favor and against Plaintiff/Counterclaim Defendant as follows:

A)  declaring that the Subscription Agreement is void;

B)  declaring that Defendant is not obligated to consummate the Closing because of the failure of a Subscriber Condition;

C)  declaring that Plaintiff cannot recover under the Subscription Agreement;

D)  awarding judgment to Defendant based on Plaintiff's fraudulent inducement;

E)  awarding judgment to Defendant based on Plaintiff's breach of contract;

F)  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Defendant/Counterclaim-Plaintiffs demand trial by jury of all issues so triable.

Dated: New York, New York
       October 10, 2022

OLSHAN FROME WOLOSKY LLP


By:   */s/ Jeremy M. King*
      Jeremy M. King
      Jacqueline Y. Ma
      *Attorneys for Defendant*
      1325 Avenue of the Americas
      New York, New York 10019
      (212) 451-2300